Philip M. Black (SBN 308619)
Matthew Insley-Pruitt (*Pro Hac Vice* application forthcoming)
Justyn Millamena (*Pro Hac Vice* application forthcoming)
**WOLF POPPER LLP**
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Email:  pblack@wolfpopper.com
          minsley-pruitt@wolfpopper.com
          jmillamena@wolfpopper.com

*Attorneys for Plaintiff and the Putative Class*
*(additional counsel on signature page)*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOAH HERMANN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BRIAN VELUZ-NEPOMUCENO, PERCIVAL ONG, MIDNIGHT HUB, AND ROOMS.TV,<br><br>Defendants. | No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

Plaintiff Noah Hermann ("Plaintiff"), by and through his attorneys, allege the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, among other things, Plaintiff's counsel's investigation, which includes, without limitation, review and analysis of news articles, websites, state corporate filings, other publicly available information concerning the Defendants (as defined herein) and the Midnight Hub: ROOMS NFTs and the Digital Nomads NFTs (collectively, "NFTs" or "Securities").

## I.    NATURE OF THE ACTION

1.    Defendants promoted a Web3 ecosystem that they called Midnight Hub. This was supposed to be a community-driven platform that would facilitate the growth and development of decentralized, community-run networks and projects, such as a community-run streaming platform called Digital Nomads TV or Rooms.tv. The ecosystem was supposed to celebrate the "digital nomad" lifestyle, where individuals could work from anywhere across the world. The Rooms.tv platform was supposed to be a place where users could combine live video streams and social media accounts, such as Twitter and Discord.

2.    In order to fund the development of this project, Defendants created and sold two non-fungible tokens ("NFTs") that were inspired by decentralization and the concept of the non-traditional, remote work lifestyle—the Midnight Hub: ROOMS NFT and, separately, the Digital Nomads NFT. Defendants stated that the proceeds from the sale and royalties of these NFTs would be reinvested into the platform, allowing for further development of the project.

3.    In their promotion of the NFTs, Defendants emphasized the NFTs' utilities and promised rewards and shared revenue from the platform. In order to receive these benefits, community members had to hold both the Midnight Hub: ROOMS NFT and the Digital Nomads NFT. Together, the Midnight Hub: ROOMS NFT and the Digital Nomads NFT constituted a fully realized security.

4.    However, shortly after selling the Digital Nomads NFTs and raising substantial amounts of money, Defendants went radio silent and never did anything substantial to develop the Midnight Hub ecosystem or its underlying projects further. The project was a "rug pull"—

the Defendants raised substantial funds from investors like Plaintiff and other members of the proposed class and did nothing in return, pulling the rug out from under Plaintiff and other investors.  Defendants' statements promoting the NFTs were untrue or misleading statements of material fact, and omitted to state material information to make the statements not misleading.  In truth, at the time Defendants sold the NFTs, Defendants had no plan for developing Midnight Hub's infrastructure or any of the platform's decentralized projects such as the Digital Nomads TV.  In fact, Defendants had no plans for the future of Midnight Hub aside from profiting off the hype and excitement around the project. After the rug pull, the value of the NFTs declined to near zero, damaging Plaintiff and putative class members.

5.      Defendants made false and misleading statements and omissions designed to prop the value of the Midnight Hub: ROOMS NFT and the Digital Nomads NFT for their own benefit in violation of Sections 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77l(a)(2), 77o.

6.      Moreover, at all relevant times, the NFTs were securities as defined by Section 2(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).  However, no registration statement was ever filed with the U.S. Securities and Exchange Commission ("SEC") to register the Securities for sale.

7.      The Defendants issued, sold, promoted, solicited the sale of, and/or solicited Plaintiff to purchase unregistered securities in violation of Sections 5, 12(a)(1), and 15 of the Securities Act.  15 U.S.C. §§ 77e, 77l(a)(1), 77o.

8.      Additionally, in the alternative that the Court determines that the NFTs at issue are not securities, Defendants' conduct amounts to violations under California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, et seq. (the "CLRA") and California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq. (the "UCL").

## II.    JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 77v, which vests jurisdiction for claims under the Securities Act in U.S. District Courts.

10.    This Court further has jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367 because they are related to claims within the Court's original subject matter jurisdiction and form part of the same case or controversy.

11.    This Court has personal jurisdiction over each of the Defendants because each either conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 77v because Defendants are located in, reside in, or are inhabitants of this District, the Defendants transact business in this District, and/or many of the acts charged herein occurred in substantial part in this District.  For example, the Midnight Hub: ROOMS NFTs were sold by the Defendants through the Magic Eden platform, which is an NFT marketplace headquartered in San Francisco, California.

13.    In connection with the acts, transactions, and conduct alleged herein, Defendants:

a)    Made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell the unregistered securities at issue in this litigation through the use or medium of any prospectus or otherwise;

b)    Carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, the unregistered securities at issue in this litigation for the purpose of sale or for delivery after sale; and

c)    Made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise the unregistered securities at issue in this litigation.

## III.    PARTIES

### A.    Plaintiff

14.    Plaintiff Noah Hermann purchased 301 of the Midnight Hub Rooms NFTs and Digital Nomad NFTs, unregistered securities, for a net expenditure of 315.69 $SOL, and was

damaged thereby.  Plaintiff Noah Hermann is a resident of St. Gallen, Switzerland.  Plaintiff Noah Hermann's purchases of the NFTs took place between January 15, 2023 and March 31, 2024. Plaintiff Noah Hermann purchased Securities through Magic Eden, which is an exchange for the sale of NFTs on the Solana blockchain, and whose headquarters is located in San Francisco, California, United States. Plaintiff Noah Hermann also purchased Securities through Defendants' Midnight Hub website.  Plaintiff Hermann's transactions in the NFTs are set forth in the accompanying certification.

**B.    Defendants**

15.    Rooms.tv is a general stock corporation organized and existing under the laws of the State of California. Rooms.tv's principal place of business in the United States is located in San Bruno, CA.

16.    Midnight Hub is a general stock corporation organized and existing under the laws of the State of California. Midnight Hub's principal place of business in the United States is located in San Bruno, CA.

17.    Brian Veluz-Nepomuceno is the Chief Executive Officer of both Rooms.tv and Midnight Hub. Brian Veluz-Nepomuceno is a resident of San Bruno, CA.

18.    Percival Ong has been the Secretary, Chief Operating Officer, and the Chief Financial Officer of both Rooms.tv and Midnight Hub. Percival Ong is a resident of San Jose, CA.

19.    Rooms.tv, Midnight Hub, and Brian Veluz-Nepomuceno all share the same address, which appears to be a residential building.

20.    Defendants listed in paragraphs 17 through 20 are referred to herein collectively as the "Defendants."

21.    Defendants Brian Veluz-Nepomuceno and Percival Ong are referred to herein as the "Control Person Defendants," or the "Individual Defendants."

## IV.   FACTUAL ALLEGATIONS

### A.   Background on Blockchains and NFTs

22.   A "blockchain" is a decentralized digital ledger, and is generally associated with the transfer and recording of digital currencies (often called cryptocurrencies, or crypto for short) and digital assets.

23.   Blockchains can be used to store information about the transfer of the digital asset, and effect the transfer of the digital asset.

24.   A traditional ledger, like ones at a bank, are managed and validated by a central authority.

25.   Blockchains are distributed and decentralized ledgers, which can offer greater transparency as to ownership by being based on consensus as to the accuracy of the transactions consummated on the network. To reach consensus, embedded in each blockchain platform is a software protocol, or consensus mechanism, which provides governance standards over how information is added to the blockchain.

26.   Blockchain-based transactions are considered by some to be more secure and trustworthy than ledgers controlled by centralized authorities, like a bank, because adding, changing, or removing information from the blockchain is made purposefully difficult, making it harder to falsify a transaction or hack into the ledger itself.

27.   Non-Fungible Tokens, or NFTs, are digital assets whose authenticity and ownership can be recorded on a blockchain.

### B.   The Midnight Hub Project

28.   Midnight Hub was advertised by Defendants as a community-driven ecosystem designed for Web3 enthusiasts, which would function as a hub for individuals actively involved in the space. It would provide a centralized platform where users can share research, engage in live streaming, conduct interviews, offer advisory services, and participate in talent acquisition activities (the "Project").

29.   "Web3" (sometimes called "Web 3.0") is a term intended to describe a new, decentralized internet built on blockchain technology that is still in its development stages. In

theory, if Web3 is fully implemented, control over the Internet will transition from the few large corporations that have the most control over the internet currently to decentralized, community-run networks.

30.    Defendants claimed that the Midnight Hub ecosystem would cater to a broad range of needs within the Web3 community, positioning itself as a one-stop shop for operators and participants. According to Defendants, its focus was on fostering collaboration and facilitating the growth and development of Web3 projects. Included in these tools was the "first of its kind streaming platform that caters to the WEB3 ecosystem,"[1] which was referred to at different times as either "Digital Nomads TV" or "Rooms.tv."

31.    Midnight Hub consisted of three distinct elements, each with its own set of utilities and features. The first element was the Midnight Hub DAO, a decentralized autonomous organization created to allow community governance over the platform's direction.

32.    Through the DAO, members would be able to propose changes, vote on important issues, and participate in the decision-making process that drives the development of Midnight Hub.

33.    The second element was represented by two unique collections of non-fungible tokens ("NFTs"): Midnight Hub: ROOMS and Digital Nomads. The Midnight Hub: ROOMS collection comprised of 2,525 animated 3D rooms on the Solana blockchain, each offering specific utilities, such as premium access to the platform and the ability to earn "tokens" (as described below). The Digital Nomads collection, set to complement the ROOMS collection, would provide additional utilities and exclusive benefits for its holders:

34.    The third element was the proposed Nomads Token ($NMDS), a utility token[2] intended for use within the platform. Users of Midnight Hub were promised the ability to earn

---

[1] https://magiceden.us/launchpad/midnight_hub_rooms.

[2] A "utility token" is a digital token of cryptocurrency that is issued in order to fund development of the cryptocurrency and that can be later used to purchase a good or service offered by the issuer of the cryptocurrency. *See* https://www.merriam-webster.com/dictionary/utility%20token#:~:text=noun,fundraising%20for%20the%20start%2D up.

and spend $NMDS through various interactions, including staking NFTs,[3] engaging in platform activities, and participating in content creation. This token would form an integral part of the platform's economy, allowing users to benefit from their participation and contributions to the Midnight Hub ecosystem. The Project, through its decentralized governance and platform offerings, aimed to empower individuals within the Web3 space and foster a collaborative community of like-minded individuals.

35.     Holders of the Midnight Hub: ROOMS NFTs were promised premium access to the Digital Nomads TV streaming platform. Defendants represented that this platform would provide a unique visual experience to the Web3 community, allowing both small and large audiences to connect through Web3 technology.  Defendants claimed that users would be able to connect using their Twitter or Discord accounts and participate in token transactions via Web3 wallets. These tokens could be earned by holding a combination of ROOMS NFTs and other collections, such as the Digital Nomads collection.

36.     Defendants stated that in addition to access, holders could enhance their engagement on the platform by taking their interactions to the next level, including by entering rooms with their favorite hosts in the metaverse. According to Defendants, the platform was designed to integrate the NFT ecosystem into a broader Web3 experience, offering users the ability to scale their interactions and further immerse themselves in both digital spaces and the community-driven content.

37.     Defendants claimed that the $NMDS token's utility was extensive.  Defendants stated that holders of the ROOMS NFTs would be able to stake their NFTs to earn $NMDS, which would be the primary currency used within the platform.  According to Defendants, holders of the truly unique ROOMS NFTs—referred to as "1 of 1" NFTs—would gain "full creator access

---

[3] "Staking" is a process by which an NFT holder attaches or locks an NFT onto a platform or protocol. Holders who stake their NFTs sometimes receive compensation or rewards in return. Staking crypto assets enables issuers and holders of other NFTs to ensure that all transactions are verified and secured without having to rely on a bank or payment processor. *See* https://www.coinbase.com/learn/crypto-basics/what-is-staking.

to all features of Digital Nomads TV,[4] allowing for enhanced content creation and interaction. Additionally, Defendants claimed that holders would have access to customized and exclusive channels within the platform that are reserved only for those who own these NFTs.

38.     The Defendants also promised future benefits related to the platform, including receiving a free NFT when the collection issued.  Defendants stated that while the platform was being developed, holders would receive industry-standard benefits that provided additional value.

39.     According to Defendants, the Midnight Hub Digital Nomads NFT collection consisted of unique, one-of-a-kind characters, each with its own backstory and personality. These NFTs were integrated with the ROOMS digital assets, where combining a Digital Nomad with a ROOM NFT unlocked access to "The Key," enabling holders to receive airdrops,[5] such as NFTs referred to as backpacks with varying benefits. The Digital Nomads collection promised a range of utilities for holders, including full creator access to platform features, exclusive room channels, advanced feature testing, and no platform fees.

40.     Defendants also promised that NFT holders would share in the Project's future revenue.  In the discussion of the benefits for ROOMS NFT, the project listing stated that one of the utilities for ROOMS holders was that they would have "Revenue Share (exact details TBC)."[6] Additionally, investors were promised a 25% profit share if they held the combination of both ROOMS and Digital Nomads. The rate of return was based on the number of NFTs staked, with one ROOM and eight Digital Nomads yielding eight points. Profits generated by Midnight Hub were to be distributed in proportion to the points each holder earned.

41.     The Defendants provided details in a whitepaper[7] that they prepared to promote and sell the Digital Nomads NFTs:

---

[4] https://magiceden.us/launchpad/midnight_hub_rooms

[5] A cryptocurrency "airdrop" is a marketing strategy that involves sending crypto assets such as coins or NFTs to digital wallet addresses. (https://www.investopedia.com/terms/a/airdrop-cryptocurrency.asp).

[6] https://magiceden.us/launchpad/midnight_hub_rooms, copied at https://perma.cc/J4VJ-YZU6

[7] https://docs.google.com/presentation/d/1X9lHmdVJbMTAedd-e0FNBMze3-VUt1gm7LodmJDSX6E/edit#slide=id.p.

C.    **The Securities**

42.    Defendants offered several different crypto assets.  The most important offerings were two NFT collections: the Midnight Hubs Rooms NFTs and the Digital Nomads NFTs.

43.    In early 2023, Defendants Brian Veluz-Nepomuceno, Rooms.tv and Midnight Hub, both California Stock Corporations, and their agents (collectively, the "Soliciting Defendants") began promoting and marketing the NFTs. These promotions occurred across various platforms, including social media and online NFT marketplaces. The marketing emphasized the NFTs' utilities, which included a staking multiplier with the Rooms digital assets, granting holders access to "The Key," a feature allowing the receipt of airdropped items such as backpacks with distinct benefits. The NFTs were also promoted as providing holders with access to full creator features on Rooms.tv, exclusive channels, profit-sharing arrangements, and fee waivers.

44.    The Digital Nomads NFTs were marketed as financial instruments, offering promises of profit from staking rewards and shared revenue from the platform. These characteristics, along with the emphasis on the efforts of the Project's developers to deliver platform updates created a reasonable expectation of profit, classifying the NFTs as securities under the "Howey test."

45.     On January 15, 2023, the Soliciting Defendants began selling the ROOMS NFTs in exchange for the cryptocurrency Solana ($SOL).  The NFTs were sold through the Magic Eden marketplace, with sales netting Defendants Rooms.tv and Midnight Hub an amount between 12,329 $SOL  and 12,625 $SOL.[8] These sales generated substantial revenue for the Project.

46.     The Rooms NFTs were part of Magic Eden's "launchpad" platform, which highlighted certain NFT projects.[9]   The project page can be found at https://magiceden.us/launchpad/midnight_hub_rooms,   preserved at   https://perma.cc/J4VJ-YZU6.  While each NFT had different attributes that made them individually unique, they were part of a collection with similar appearances.  Some examples of the NFTs looked like this:



47.     On or around October 25, 2023, the Soliciting Defendants began selling the Digital Nomads NFTs in exchange for the cryptocurrency Solana ($SOL).  There were 7,000 Digital Nomad NFTs made available, which were sold for roughly prices ranging from 1.5 to 2.2 SOL.[10]

---

[8] The ROOMS NFTs were offered in four distinct "Mint Stages," with the first, private Mint Stage allowing for the NFTs to be purchased for 4 $SOL.  This Mint Stage had 296 total wallets in the whitelist and a limit of 1 mint per wallet.  In the subsequent Mint Stages, the NFTs were sold for 5 $SOL.   Minting is the process where a unique token, such as an NFT, is created on a blockchain.

[9] Projects had to apply to be listed on the launchpad platform, and the descriptions originated from the Defendants. *See, e.g.*, https://help.magiceden.io/en/articles/5858610-how-to-apply-for-launching-your-collection-on-me-launchpad

[10] The first 2,500 NFTs were available at a pre-sale price of 1.5 SOL; the next 2,000 were available for 2.0 SOL; the last 2,500 were available to the public at 2.2 SOL.

Like the Rooms NFT, each Digital Nomad had over 150 unique attributes or traits that made them individual, but they had similarities across the collection.  Some example Digital Nomad NFTs looked like this:



48.    The NFTs were sold through Defendants' Digital Nomads website and the platform Magic Eden, with initial sales netting the Defendants Rooms.tv and Midnight Hub 13,250 SOL.

49.    Embedded in each Rooms and Digital Nomads NFT was a 5% royalty provision, allowing the Soliciting Defendants to receive a percentage of all secondary sales. Each successive sale of these NFT was intended to include a payment to the Defendants.

50.    Moreover, Defendants initiated private communication channels, purportedly designed to engage directly with collectors of ROOMS NFTs, Digital Nomads NFTs, and $NMDS utility tokens, and the community. However, these channels primarily served to maintain speculative interest in the NFTs and sustain the market value of the Digital Nomads collection.

**D.    Digital Nomads are Securities Subject to Regulation Under the Securities Act**

51.    Section 2(1) of the Securities Act defines the term "security" to mean:

any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other

> mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(a)(1).

52.    An "investment contract" includes transactions involving an investment of money in a common enterprise with the expectation of profits to come from the efforts of others.

53.    The ROOMS NFTs and Digital Nomads NFTs (hereinafter the "Securities") are investment contracts, and are therefore securities subject to regulation under the Securities Act.

**i.    The Securities Involved a Common Enterprise**

54.    The Securities involve a common enterprise because they concern a sharing or pooling of the funds of investors, and the fortunes of each investor in the pool of investors are tied to one another and to the success of the investment pool. The sale of the Securities was used by the Soliciting Defendants to secure financial investment from the public, including Plaintiff, for the purpose of funding the development of Rooms.tv and its broader Web3 ecosystem. The proceeds from the sale of the Securities were pooled together and used to fund the development of the creator hub and the platform's digital infrastructure.

55.    Defendants represented to investors that the proceeds from the sale of the Securities would be reinvested into Midnight Hub's vision, including the development of the streaming platform. The pooling of investor assets and the development of the platform created a shared outcome between the investors and the investment pool, *i.e.*, a successful platform and staking mechanism. These initiatives were positioned to drive up the value of the Securities, providing profits to the investors including Plaintiff.

56.    The description, published on or before January 15, 2023 on Magic Eden, of how the funds from the sale of the Midnight Hub: ROOMS NFT would be split made this explicit:

**Mint Funds Breakdown:**

**Team 27%** - this goes primarily to cover the team's expenses that have been incurred over the course of the last 3 months for primary development of the platform, as well as developer fees and infrastructure costs. A part of this will also

be used as compensation for the founding team (Vitamin [i.e., Defendant Veluz-Nepomuceno], IJ, Kuuya, Jusssdewit). This compensation will last us throughout the development of the alpha version of the platform.

**Marketing 9%** - This portion of the funds will be used entirely to set up marketing campaigns, onboard marketing professionals for the preliminary strategies of pushing the platform out across multiple chains.

**Development 64%** - logically, the largest chunk of the mint proceeds will be injected directly into the platform. These injections will be in the form of infrastructure upgrades, cyber security, full stack developers, UI/UX improvements, feature integrations etc.

https://magiceden.us/launchpad/midnight_hub_rooms, preserved at https://perma.cc/J4VJ-YZU6

57.     The failure of the investment pool would also impact the investors, as the inability to develop Rooms.tv and its streaming service would have a negative impact and lead to the decrease in the value of the Securities.

58.     The Securities also involved a common enterprise because the fortunes of the investors in the Securities, including Plaintiff and the class, were tied to the fortunes of the Defendants and other promoters. The potential returns for investors were directly tied to the success of these initiatives, which would, in turn, increase the value of the Securities. Without the efforts of the promoters, appreciation in the value of the Securities could not be realized.

59.     As such, the sale of Securities involved a common enterprise.

**ii.     The Securities Were Sold and Purchased With the Expectation of Profits from the Efforts of Others**

60.     The Securities were sold and purchased with the expectation of profits to come from the efforts of the Defendants and others.

61.     The Defendants' promotional, marketing, and solicitation activities fostered a reasonable belief among investors that they would receive profits, particularly through staking mechanisms, profit sharing, and the potential appreciation in the value of the NFTs. Defendants emphasized that profits would be derived from the development and success of Rooms.tv and the associated Web3 streaming platform, including 25% of the revenues from the service.

62.     The generation of profits for Securities holders was fundamentally dependent on the continuous efforts of the Midnight Hub managerial team, including their ability to execute the

broader vision of the Midnight Hub Project and create a thriving ecosystem that would elevate the value of the NFTs. Investors were led to believe that their financial returns would result from the development of Rooms.tv and the staking of NFTs, which would unlock profit-sharing opportunities.

63.     Additionally, the sale of the Securities was marketed as an investment, with Defendants promoting the idea that the NFTs would increase in value. The Defendants repeatedly emphasized that as the platform developed, the value of the NFTs would appreciate due to their integral role within the Web3 ecosystem. Defendants further highlighted the profit-sharing structure and staking multipliers as mechanisms to generate financial returns for NFT holders, reinforcing the investment narrative.

64.     As such, profits for the Securities were to be derived solely from the efforts of others.

**iii.     The Sale and Purchase of the Securities Took Place in the United States**

65.     The Securities were sold in part through Magic Eden, a prominent NFT marketplace, which is headquartered in San Francisco, California, United States. The Securities were also sold using the Solana blockchain, which facilitates transactions involving cryptocurrency-based assets like NFTs, further tying the sales to U.S. commerce due to Solana Labs' headquarters in San Francisco.

66.     Secondary sales of the Securities also occurred on Magic Eden, which continued to host trades for holders and potential investors. These transactions occurred primarily through U.S.-based platforms, where buyers and sellers engaged in ongoing trading activity.

67.     Plaintiff purchased Securities through the platforms listed above, which were primarily based in the United States. Therefore, the purchase of the Securities by Plaintiff took place in the United States.

68.     Additionally, both of the corporations and the Individual Defendants are located in California.

**E.    The Sale of the Securities Violated the Securities Act**

69.    Unless a registration statement is in effect with respect to a security, Section 5(a) of the Securities Act makes it unlawful for any person:

> (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

15 U.S.C. § 77e(a).

70.    Section 5(c) also makes it unlawful for any person "to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security." 15 U.S.C. § 77e(a).

71.    A registration statement has never has been in effect, or even filed, to register the Securities with the SEC.

72.    The sales and solicitations of these Securities were conducted through the internet, a means of interstate communication. For example, the Defendants used platforms such as Magic Eden and social media to offer and sell the Digital Nomads NFTs across state lines and internationally, all without registering the Securities with the SEC. This constitutes a clear violation of 15 U.S.C. § 77e(a).

**F.    The Defendants Are Liable to Plaintiff for the Sale of Unregistered Securities Pursuant to Section 12(a)(1) of the Securities Act**

73.    Section 12(a)(1) of the Securities Act provides that any person who sells a security in violation of Section 5 is liable to:

> the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77l(a)(1).

74.     A person is liable under Section 12(a)(1) of the Securities Act if that person is a statutory seller, defined as a person who (1) passed title, or other interest in the security, to the buyer for value, or (2) successfully solicited the purchase of securities, so long as the person is motivated at least in part by a desire to serve his, her, or its own financial interests or those of the security's owner.

75.     The Soliciting Defendants passed title to the Securities to Plaintiff between January 15, 2023 and March 31, 2024, making them statutory sellers with regard to those sales.

76.     Further, the Soliciting Defendants and/or their agents made numerous public statements touting the Securities, their potential for profit, and encouraging the purchase of the Securities. As such these defendants solicited the purchase of the Securities for their own financial interest.

77.     For example, on or around September 2023, Brian Veluz-Nepomuceno, through Rooms.tv and Midnight Hub made statements on the Digital Nomads whitepaper that described the profit sharing, staking mechanism, corporate visions and airdrops that highlighted the growth potential for the Project and profit sharing opportunity for the owners of the NFTs.

**G.     Plaintiff's Section 12(a)(1) Securities Act Claims Are Timely**

78.     The statute of limitations for claims under Section 12(a)(1) is one year from purchase or delivery, whichever is later.

79.     Defendants began offering ROOMS NFTs on January 15, 2023.  Holders of ROOMS NFTs were able to purchase Digital Nomads NFTs.  Defendants began offering Digital Nomads NFTs in or around October 25, 2023.

80.     Defendants represented that only holders of both the ROOM NFT and the Digital Nomads NFTs would be given access to staking benefits and revenue sharing.  In other words, the ROOM NFT and Digital Nomads NFT were fully realized securities when held together and were only such after the sale of Digital Nomads NFTs beginning in or around October 23, 2023. Plaintiff received his Digital Nomads NFTs on or after March 31, 2024.

81. Plaintiff purchased his ROOMS NFTs between January 15, 2023 and March 31, 2024. Plaintiff purchased his Digital Nomads NFTs between October 25, 2023 and March 31, 2024.

82. Any Security derived from the ROOM NFT and Digital Nomads NFT held together was delivered to the Investors, only after the sale of the Digital Nomads NFT. Plaintiff received Digital Nomads that he minted on or around November 5, 2023.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

83. Defendants made numerous untrue statements of material fact or omitted to state material facts necessary to make the statements made not misleading in subject matters related to the development and long-term viability of Midnight Hub.

84. The statements made contained untrue statements of material fact or omitted to state material facts necessary to make the statements made not misleading. Not only were these statements untrue or misleading when made, but Defendants did not correct them by the date of the individual purchases by Plaintiff, and thus the statements were untrue or misleading as of the date of the individual purchases.

### A.    False and Misleading Statements Regarding the Project's Sustainability

85. Through communications made on Magic Eden, their own website, and on the Midnight Hub Discord and other social media platforms, the Defendants repeatedly stated that holders of its NFTs would receive exclusive benefits and partake in a revenue share.

86. For example, on January 15, 2023, Defendants made statements on Magic Eden, in connection with the sale of their ROOMS NFTs, about the benefits of holding their NFTs:

> Holders of ROOMS and the future Digital Nomads collection will earn the $NMDS token which can in-turn be used for various applications on the platform itself.
>
> Rooms can be staked to earn $NMDS which will be the token used on the Digital Nomads TV Platform.

87. On or around January 15, 2023, Defendants stated on Magic Eden that one of the "Utilities" of the ROOMS NFTs would be revenue sharing for holders: "Revenue Share (exact details TBC)."

88.    On or around September 2023, Defendants released the Digital Nomads whitepaper discussing the utility and combined value of the ROOMS NFTs and the Digital Nomads NFTs.   Defendants stated, among other things, that holders would receive special benefits and the ability to share in the Project's profits.   For example, Defendants stated that ROOMS NFT holders would receive access to special airdrops:

> This month brings an exclusive, limited edition series of airdrops. Each tier corresponds to varying levels of content, with Tier 3 being the pinnacle. Both Tier 2 and Tier 3 encompass multiple items. To secure these drops, you're required to hold a minimum of 5 rooms, with an extra backpack bonus for every set of 5 rooms you own. For instance, owning 10 rooms qualifies you for 2 backpack airdrops. Possession of a Gold or Space room enhances your likelihood of securing a higher-tiered airdrop.

89.    Defendants also stated that holders of both ROOMS NFTs and Digital Nomads NFTs would be able to receive a portion of the profits earned.   For example, in a slide discussing the "Platform Benefits" of Rooms.tv, Defendants stated that there would be a "[p]rofit Share for Multiple Room + DNMDS Holders, fee waivers, discounts."   Another slide of the whitepaper explained the mechanics of the profit sharing:

> So how will Profit share work?
>
> In order to receive profit share, you will need own [sic] and stake a Digital Nomad PFP plus a Midnight Hub ROOM. This combo earns you 1 point.
>
> The profit split will be 25% (scaled relatively), and will get distributed across each point.
>
> ex: One Rank 1 room + 8 DNMDS staked = 8 points

90.    Defendants, including Defendant Veluz-Nepomuceno, promoted the upcoming platform on Twitter and other social media sites. For example, in a Twitter Space posted on September 21, 2023, Defendant Veluz-Nepomuceno (as user @V8tamin) hosted a discussion with several other NFT projects using the Digital Nomads twitter account (https://x.com/DigitalNmds).          In          that          Twitter          Space (https://x.com/DigitalNmds/status/1704546173196059112),      Defendant      Veluz-Nepomuceno described how the upcoming Rooms.tv platform would provide a streaming solution for Web3 participants, and that it would be launched alongside the upcoming Digital Nomads NFT.   He

explained the Rooms.tv platform would assist with the "pain points" that they found in the current offerings. He also stressed the upcoming release of "backpacks," which would have additional NFTs and crypto assets, but only be available for holders of at least Rooms NFTs, and encouraged people to buy more Rooms NFTs on Magic Eden.

91.    From these statements, investors, including Plaintiff, believed that the capital raised from the sale of the ROOMS NFTs and the Digital Nomads NFTs would result in the development of a sustainable Midnight Hub ecosystem that would allow for continued benefits and profit sharing for these NFT holders.

92.    In reality, these statements were false and misleading because at the time they were made and at the time the NFTs were sold, Defendants had no actual plan or intention of developing Midnight Hub's ecosystem in a sustainable way that would allow them to continue the benefits to holders and continued profit sharing. Notably, Defendants failed to disclose critical financial information that would appraise investors of the falsity of these statements and, in fact, failed to disclose any financial information about the business whatsoever.

93.    On November 8, 2023, Defendants made their final post on X (formerly Twitter) before ceasing all forms of communication. After receiving the funds from the minting of the NFTs, no further development has been announced and the Project has ceased development. Since that time, the value of the NFTs has dropped to near zero.

## VI.    EVENTS PRIOR TO LITIGATION

94.    After Defendants abandoned the Midnight Hub Project and prior to filing this litigation, Defendants took several steps to try to suppress evidence and avoid liability.

95.    At some point prior to October 2023,[11] the main website for the Project (https://dnmds.midnighthub.io/) was deleted.

96.    Similarly, the Discord channel for the project (https://t.co/kC3MIVAl0p) was deleted at some point prior to October 2024.

---

[11] The latest snapshot of the http://midnighthub.io website on the Internet Archive's Wayback Machine was recorded on May 18, 2024. https://web.archive.org/web/20240518013549/midnighthub.io/.

97.    On October 10, 2024, Plaintiff's counsel sent a demand letter to Defendant Veluz-Nepomuceno in an attempt to resolve the matter prior to filing litigation in court.  No response was received from him or by counsel on his behalf.

98.    On October 18, 2024, after Plaintiff's demand letter was sent, Defendant Ong signed a Certificate of Dissolution in his capacity as Chief Operating Officer for both Midnight Hub and Rooms.tv.  Both forms were submitted under penalty of perjury.  Both forms were filed on October 21, 2024.  Both forms indicated that the "corporation has never incurred any known debt or liability," despite the demand sent eight days before these documents were signed.

## VII.    CLASS ACTION ALLEGATIONS

99.    This Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all purchasers of ROOMS NFTs and Digital Nomads NFTs between January 15, 2023 and March 31, 2024 (the "Class Period") who were damaged thereby (the "Class").    Defendants and Defendants' immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any of the foregoing have or had a controlling interest are excluded from the Class.

100.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, ROOMS NFTs were sold on the Magic Eden marketplace.  Throughout the Class Period, Digital Nomads NFTs were sold on Defendants' Digital Nomads website.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class.  Members of the Class may be identified by Defendants' own databases, cryptocurrency exchange databases, and blockchain data.  Upon information and belief, these shares were held by hundreds of individuals located geographically throughout the country and world.  For example, the Magic Eden website currently indicates that there are more than 470 wallets that hold the Midnight Hubs ROOMS NFTs. https://magiceden.us/marketplace/midnight_hub_rooms ?activeTab=%22items%22. Similarly, the Magic Eden website indicates that there are more than 240    wallets    that    hold    the    Digital    Nomad    NFTs.

1  https://magiceden.us/marketplace/digital_nomad_nft?activeTab=%22items%22. [12]        Joinder

2  would be highly impracticable.

3        101.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class

4  purchased ROOMS NFTs and Digital Nomads NFTs during the Class Period and sustained

5  damages from Defendants' wrongful conduct complained of herein.

6        102.    Plaintiff will fairly and adequately protect the interests of the Class and has

7  retained counsel who are competent and experienced in securities or consumer protection class

8  action litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

9        103.    Common questions of law and fact exist as to all members of the Class and

10  predominate over any questions solely affecting individual members of the Class.  Among the

11  questions of law and fact common to the Class are:

12        a)      Whether the ROOMS NFTs and Digital Nomads NFTs are securities under

13  the Securities Act;

14        b)      Whether Defendants' offerings and sales of ROOMS NFTs and Digital

15  Nomads NFTs violate the registration provisions of the Securities Act;

16        c)      Whether Defendants' omitted and/or misrepresented material facts

17  regarding critical financial information about the Project;

18        d)      Whether Defendants' conduct violated the California Unfair Competition

19  Law;

20        e)      Whether Defendants' conduct violated the California Consumer Legal

21  Remedies Act; and

22        f)      Whether the members of the Class have sustained damages and, if so, the

23  proper measure of damages.

24        104.    A class action is superior to all other available methods for the fair and efficient

25  adjudication of this controversy since joinder of all members is impracticable.  Treatment as a

26

27

28

[12] A crypto currency wallet is in some ways similar to a traditional banking account, where the crypto assets such as NFTs or cryptocurrencies are stored.  While one individual may use more than one wallet to hold their NFTs, the large number of wallets suggests a large number of Class members.

class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

105.    Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

106.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action as a class action.

**VIII.    CAUSES OF ACTION**

**COUNT I**

**For Violations of Sections 5 and 12(a)(1) of the Securities Act**

**Against All Defendants**

107.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

108.    This Count is asserted against all Defendants, and is based upon Sections 5 and 12(a)(1) of the Securities Act.

109.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.

110.     For purposes of asserting this Count, Plaintiff does not allege that the Defendants named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(1) claim.

111.    The Securities are and were securities as defined by the Securities Act.

112.    The Securities were not registered as securities with the SEC.

113.    The Defendants are statutory sellers of the Securities because they sold, promoted, or solicited the sale of the Securities and/or passed title to the Securities to Plaintiff.

114.    Defendants are therefore liable to Plaintiff for rescissory damages of $SOL for Plaintiff's purchases of the Securities in an amount to be determined at trial.

115.    Plaintiff hereby tenders his Securities back to the Defendants.

## COUNT II

### For Violations of Section 12(a)(2) of the Securities Act

### Against Defendants

116.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

117.    This Count is asserted against Defendants, and is based upon 12(a)(2) of the Securities Act.

118.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.   For purposes of asserting this Count, Plaintiff does not allege that the Defendants named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

119.    Section 12(a)(2) of the Securities Act provides that:

> Any person who…offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraphs (2) and (14) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

120.    ROOMS NFTs and Digital Nomad NFTs are, and were, securities as defined by the Securities Act.  These NFTs were not registered as securities with the SEC.

121.    From January 2023 through March 2024, in connection with the offer and sale of the ROOMS NFTs and Digital Nomads NFTs, Defendants unlawfully made statements on their website, Magic Eden, Discord, X (formerly Twitter) and other social media channels that constitute as prospectuses or oral communications within the scope of the Securities Act.

122.    The Soliciting Defendants are statutory sellers because they sold, promoted, or solicited the exchange of ROOMS NFTs and Digital Nomads NFTs and/or passed title to the NFTs to Plaintiff for their own financial benefit.  These Defendants received significant financial compensation from the initial mint and sale of the ROOMS NFTs and Digital Nomads NFTs, benefitted from an embedded royalty mechanism where they received a 5% royalty on each resale of the NFTs on secondary markets, providing them with inherent financial interest in the Securities.  As the description of the Midnight Hubs: ROOMS NFTs stated, 27% of the proceeds from the sales of the NFTs was used to pay the founding team, including Defendant Veluz-Nepomuceno (a.k.a., Vitamin).

123.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the communications and within three years of when the NFTs were sold to the public.  It became clear that Defendants ceased development of the Project only after a reasonable period of time passed without any further updates from the team and the dismantling of the Midnight Hub website.  Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions at an earlier time.

124.    By reasons of the foregoing, the Defendants are therefore liable for violations of Section 12(a)(2) of the Securities Act to the Plaintiff for Plaintiff's purchases of the NFTs pursuant to Defendants' false and misleading prospectuses and communications.

## COUNT III

**For Violations of Section 15 of the Securities Act**

**Against the Control Person Defendants**

125.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

126.    This count is asserted against the Control Person Defendants and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

127.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiff does not allege that defendants named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

128.    Section 15 of the Securities Act provides that:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

129.    As set forth above, Rooms.tv and Midnight Hub, both of which are California Stock Corporations, are strictly liable under Section 12(a)(1) of the Securities Act, and are liable under Section 12(a)(2) of the Securities Act. Defendant Brian Veluz-Nepomuceno, the founder and primary officer of Rooms.tv and Midnight Hub, participated in the operation and management of Rooms.tv and Midnight Hub and conducted and participated, directly and indirectly, in the conduct of Rooms.tv and Midnight Hub's business affairs, including the issuance of the Digital Nomads Securities.

130.    Because of his position of control and authority as a senior officer of Rooms.tv and Midnight Hub, Brian Veluz-Nepomuceno was able to, and did, control the issuance of the unregistered Digital Nomads Securities, which were unregistered securities.

131.    By virtue of the foregoing, Brian Veluz-Nepomuceno was a "controlling person" of Rooms.tv and Midnight Hub within the meaning of Section 15 of the Securities Act.

132.    Brian Veluz-Nepomuceno also had the power and influence, and exercised the same, to cause Rooms.tv to engage in the acts described herein, including by causing Rooms.tv and Midnight Hub to sell and promote the sale of unregistered securities in violation of the Securities Act. By reason of the above conduct, Brian Veluz-Nepomuceno is liable for Rooms.tv and Midnight Hub's wrongful conduct to the same extent Rooms.tv and Midnight Hub are liable under Section 12(a)(1) of the Securities Act to Plaintiff and the Class who purchased the Securities.

133.    Similarly, Defendant Percival Ong is the Chief Financial Officer of Rooms.tv. Ong participated in the operation and management of Rooms.tv and Midnight Hub and conducted and participated, directly and indirectly, in the conduct of Rooms.tv and Midnight Hub's business affairs, including the issuance of the Digital Nomads Securities.

134.    Because of his position of control and authority as a senior officer of Rooms.tv and Midnight Hub, Defendant Ong was able to, and did, control the issuance of the unregistered Digital Nomads Securities, which were unregistered securities.

135.    By virtue of the foregoing, Defendant Ong was a "controlling person" of Rooms.tv and Midnight Hub within the meaning of Section 15 of the Securities Act.

136.    Defendant Ong also had the power and influence, and exercised the same, to cause Rooms.tv and Midnight Hub to engage in the acts described herein, including by causing Rooms.tv and Midnight Hub to sell and promote the sale of unregistered securities in violation of the Securities Act. By reason of the above conduct, Ong is liable for Rooms.tv and Midnight Hub's wrongful conduct to the same extent Rooms.tv and Midnight Hub is liable under Section 12(a)(1) of the Securities Act to Plaintiff and the Class who purchased the Securities.

1

2

3

4

**COUNT IV**

**For Violations of the California Consumer Legal Remedies Act,**

**Cal. Civ. Code §§ 1750, et. seq.**

**Against All Defendants**

5

6

137.    Plaintiff repeats and realleges the allegations in Paragraphs 1 through 53 and Paragraphs 83 through 106  contained above as if fully set forth herein.

7

138.    This Count is asserted against all Defendants.

8

9

10

139.    This Count is asserted in the alternative to Counts I, II, and II in the event that the Court determines that ROOMS NFTs and Digital Nomads NFTs are not securities as defined by the Securities Act.

11

12

13

140.    The conduct of Defendants alleged above constitutes an unfair method of competition and unfair or deceptive act or practice in violation of the Consumers Legal Remedies Act, Cal. Civ. Code §1750, et seq. ("CLRA").

14

15

141.    Defendants' ROOMS NFTs and Digital Nomads NFTs are goods as defined by Cal. Civ. Code §1761(a).

16

142.    Defendants are each persons under Cal. Civ. Code § 1761(c).

17

143.    Plaintiff is a consumer under Cal. Civ. Code § 1761(d).

18

19

20

21

22

23

24

25

144.    As described above, while engaging in consumer-oriented trade or commerce within the State of California, Defendants engaged in acts and practices that constitute acts, uses, or employment of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of merchandise, and with the subsequent performance in violation of the CLRA (including Cal. Civ. Code § 1770(a)(5), (7), (9), (14), and (16)).

26

27

28

145.    Defendants' conduct is deceptive because their material omissions and partial representations were likely to and did mislead consumers and the public, including Plaintiff and the Class.

146.    Defendants failed to disclose the true facts related to the purchase of the NFTs, at a benefit to themselves and the detriment of the Plaintiff and the Class, despite their obligation to disclose due to their superior knowledge and the false and misleading partial representations they made, including as to profit sharing, staking mechanisms, corporate visions and airdrops that highlighted the growth potential for the Project and profits sharing opportunities for the NFT owners.

147.    The deceptive acts and practices of Defendants have directly, foreseeably, and proximately caused damages and injury to Plaintiff and the Class. Indeed, Defendants' false and deceptive representations caused Plaintiff to suffer damages, including investing thousands of dollars into the NFTs, the value of which have declined precipitously. Plaintiff would not have invested in the NFTs had Defendants disclosed the true facts related to the future development of their products, which Defendants knew or reasonably should have known at all relevant times.

148.    Pursuant to Cal. Civ. Code § 1782, Plaintiff is serving upon Defendants a CLRA notice letter. If Defendants fail to rectify these issues within the time period specified therein, Plaintiff will amend this Complaint, as permitted thereby, to assert claims for additional relief, including damages and punitive damages pursuant to Cal. Civ. Code §3294.

149.    Plaintiff is entitled to pursue claims against Defendants to enjoin Defendants from continuing their unfair or deceptive acts or practices under Cal. Civ. Code § 1780(a) and § 1781, as well as to pursue costs and attorneys' fees under § 1780(e).

## COUNT V

**For Violations of the California Unfair Competition Law,**

**Cal. Civ. Code § 17200, et. seq.**

**Against All Defendants**

150.    Plaintiff repeats and realleges the allegations in Paragraphs 1 through 53 and Paragraphs 83 through 106 contained above as if fully set forth herein.

151.    This Count is asserted in the alternative to Counts I, II, and II in the event that the Court determines that ROOMS NFTs and Digital Nomads NFTs are not securities as defined by the Securities Act.

152.    Plaintiff asserts this cause of action against Defendants for unlawful, unfair and fraudulent business practices; and unfair, deceptive, untrue and misleading advertising, as defined by California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. (the "UCL").

153.    Defendants' conduct violates the UCL, as the acts and practices of Defendants constitute a common and continuing course of conduct by means of "unlawful" "unfair" and "fraudulent" business acts or practices within the meaning of the UCL.

154.    As described above, while engaging in trade or commerce within the State of California during the time period relevant hereto, Defendants sold ROOMS NFTs and the Digital Nomads NFTs in exchange for the cryptocurrency Solana ($SOL), which earned Defendants a profit.

155.    Further, Defendants made numerous public statements touting the ROOMS NFTs and the Digital Nomads NFTs, their potential for profit, and encouraged the purchase of these NFTs, despite knowing these would have little value soon after the original mint and sale.

156.    Defendants' conduct is unfair, because its utility, if any, is greatly outweighed by the harm it causes to Plaintiff; and because it is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers; and because it violates established public policy as alleged herein.

157.    Defendants' practices were fraudulent because they represented that they were building the new streaming platform, that they would deploy the platform publicly after the sale of the NFTs, and that the purchasers of the NFTs would receive many benefits including sharing 25% of the platform's revenues. Defendants also omitted the simple fact that they did not have a plausible plan to accomplish these goals, as became evident when all public development of the platform ceased shortly after receiving the investors' funds.

158.    Defendants' practices were unlawful and in violation of Civ. Code §§ 1750 et seq. because they knowingly or having had reason to know, made misrepresentations and omissions of material fact of which they had a duty to disclose to Plaintiff and the Class.

159.    As a direct and proximate cause of Defendants' violations of the UCL, Plaintiff and the Class suffered an injury in fact and have suffered monetary harm. Defendants, on the

1   other hand, have been unjustly enriched. Plaintiff is entitled to pursue a claim against Defendants

2   on behalf of the Class pursuant to the UCL for restitution and equitable relief to remedy

3   Defendants' unlawful and unfair practices, and to move under Cal. Code Civ. Prac. § 1021.5 for

4   costs and attorneys' fees.

5 **IX.    PRAYER FOR RELIEF**

6       **WHEREFORE**, Plaintiff, individually and on behalf of the Class, prays for relief and

7   judgment as follows:

8       A.      Awarding Plaintiff and the Class damages in an amount that may be proven at trial,

9   together with interest thereon;

10       B.      Ordering disgorgement of Defendants' unjust enrichment;

11       C.      Awarding Plaintiff and the Class members rescissory damages of $SOL;

12       D.      Awarding Plaintiff his reasonable attorneys' and experts' witness fees and other

13   costs;

14       E.      Awarding Plaintiff and the members of the Class pre-judgment and post-judgment

15   interest; and

16       F.      Awarding such other relief as this Court deems appropriate.

17 **X.    JURY DEMAND**

18       Plaintiff requests a trial by jury of all claims that can be so tried.

19   ///

20   ///

21   ///

22   ///

23   Dated: November 5, 2024      Respectfully submitted,

24                           **WOLF POPPER LLP**

25                           By:   /s/ Philip M. Black

26                              Philip M. Black

27                           Philip M. Black (SBN 308619)

28                           Matthew Insley-Pruitt (*Pro Hac Vice* application
                                    forthcoming)

1

2

3

4

Justyn Millamena (*Pro Hac Vice* application forthcoming)
845 Third Avenue, 12th Floor
New York, NY 10022
Telephone: (212) 759-4600
Email: pblack@wolfpopper.com
       minsley-pruitt@wolfpopper.com
       jmillamena@wolfpopper.com

5

6

*Attorneys for Plaintiff and the Putative Class*

7

8

9

Max Burwick (*Pro Hac Vice* application forthcoming)
BURWICK LAW, PLLC
43 West 43rd Street, Suite 114
New York, NY 10036
Email: max@burwick.law

10

*Attorneys for Plaintiff and the Putative Class*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT       31